AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Laura Luz Maria Torres Romero,<br>aka Antonieta Vinkelried, aka Antonieta Winkelried,<br>aka Antonieta Mena<br><br>*Defendant(s)* | Case No. 20-mj-8229-DLB. |

FILED BY ___SP___ D.C.
Jun 29, 2020
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  __2012 throught March 2020__  in the county of  __Palm Beach__  in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 371 | Conspiracy to subscribe false immigration applications & Steal government money |
| 18 USC Section 1028A | Aggravated Identity Theft |
| 18 USC Section 1956(h) | Conspiracy to launder money |
| 18 USC Section 981(a)(1)(C) | Criminal forfeiture |
| 18 USC Section 982(a)(6) | Criminal forfeiture |
| 18 USC Section 982(a)(1) | Criminal forfeiture |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

*Complainant's signature*

S/A Carlos Ruiz, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ~~06/30/2020~~ 06/29/2020

*Judge's signature*

City and state:   WEST PALM BEACH, FLORIDA    DAVE LEE BRANNON, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Carlos Ruiz, being duly sworn, do hereby state the following:

1. I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since May 2008. I have received training through the HSI training program at Glynco, Georgia, and conducted investigations into criminal violations of the federal laws governing immigration and illegal trafficking and importation of counterfeit merchandise and narcotics into the United States. I was assigned to the HSI Document and Benefit Task Force for three years where I conducted numerous investigations involving fraudulent immigration documents and schemes to defraud the United States Citizenship and Immigration Services (USCIS). I also participated in the execution of search warrants in numerous immigration fraud cases. Before joining HSI, I was an Officer with the DHS, USCIS, for approximately four years, where I was responsible for adjudicating applications for adjustment of status and naturalization. I have a Master's Degree and Bachelor's Degree in Criminal Justice.

2. Michael A. Galdys, the co-case agent on this case, has been employed as a special agent with the United States Department of Treasury, Internal Revenue Service, Criminal Investigation (hereafter IRS-CI) for approximately 15 years. Agent Galdys is responsible for investigating possible violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), and the money laundering statutes (Title 18, United States Code). He has personally investigated and/or assisted in the investigation of these violations. In addition, he has received training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where he learned how to investigate potential crimes relating to the above statutes, in addition to appropriate disclosure guidelines and Federal Rules of Evidence. He has also attended seminars relative to these laws and their violation. Prior to being employed by the Internal Revenue Service (hereafter IRS), he was employed by two major Wall Street firms as a Financial Advisor for approximately 6 years. He was also employed as a Commercial Lender for approximately 2 years, where he routinely analyzed personal and corporate tax returns in order to

determine cash flow and credit risk. He has a Master's Degree in Business Administration and a Bachelor's Degree in Aviation Management, Cum Laude.

3. I make this affidavit in support of a complaint charging Laura Luz Maria Torres Romero, a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried a/k/a Antonieta Mena, with the following charges:

> (1) Conspiracy to (a) knowingly subscribe as true, under penalty of perjury under 28 U.S.C. § 1746, false statements with respect to material facts in applications submitted to United States Citizenship and Immigration Services, in violation of 18 U.S.C. § 1546(a), and (b) steal Internal Revenue Service (IRS) tax refund checks, in violation of 18 U.S.C. § 641; all in violation of 18 U.S.C. § 371;
>
> (2) Knowingly possess and use, without lawful authority, the means of identification of others, that is, names and social security numbers, during and in relation to any felony violation, that is, theft of government money, in violation of 18 U.S.C. § 641, all in violation of 18 U.S.C. § 1028A(a)(1); and
>
> (3) Conspiracy to launder the proceeds of the tax refund scheme, in violation of 18 U.S.C. § 1956(h).

4. I am familiar with all the facts and circumstances surrounding this investigation, as set forth herein, from my own investigative efforts, from information obtained from co-case agent Michael A. Galdys, from witness interviews, and from my review of records, including bank account records, financial records, corporate documents, immigration records, IRS records and assorted other business records. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts believed necessary to establish probable cause to obtain a criminal complaint and arrest warrant for Laura Luz Maria Torres Romero, a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried a/k/a Antonieta Mena.

**Immigration Fraud Conspiracy (18 U.S.C. § 371)**

2

### A. Asylum Process

5. Asylum status is a form of protection available to eligible individuals who are located within the United States and who are subject to or fear they will suffer persecution in their native countries because of race, religion, nationality, membership in a particular social group, or political opinion. To apply for asylum, an individual must file a Form I-589, Application for Asylum and for Withholding of Removal (hereinafter "asylum application"), with the United States Citizenship and Immigration Services (hereinafter "USCIS"), within one year of the individual's arrival in the United States. An application filed after the one-year period will be denied unless the applicant can establish changed circumstances that materially affect his or her asylum eligibility or extraordinary circumstances that caused the delay in filing.

6. If an asylum application is prepared by someone other than the applicant or an immediate family member (spouse, parent(s) or children), that person must complete and sign Part E of the asylum application, certifying that he has prepared the application at the request of the applicant, that the responses provided are based on information of which the preparer has knowledge or which was provided to the preparer by the applicant, and that the completed application was read to the applicant in his or her native language. The preparer must also sign the application and certify that he is aware that putting false information on the application may subject the preparer to civil and criminal penalties.

7. When USCIS receives an asylum application, they will conduct various record checks and then forward the application to one of eight asylum offices in the United States. The asylum office will schedule the applicant for an interview before an asylum officer. At the interview, the applicant may present supporting documents to establish identity and to bolster his or her asylum claim. After the asylum interview, the asylum office will make a determination to either grant asylum or to refer the applicant to an immigration judge for final determination.

8. If an asylum application is pending for 150 days or more, the applicant is eligible to apply for permission to work in the United States, by filing an I-765 Application for Employment Authorization. An Employment Authorization Document (EAD), also known as a "work permit," will be issued to any

applicant who has an asylum application pending for at least 180 days. In these situations, the issuance of a work permit is automatic and is not based on an evaluation of the merits of the pending asylum claim. An EAD allows the applicant to lawfully accept employment in the United States, obtain a Social Security number, and, in certain states, apply for a Driver's License. When an Asylum Application is pending, there is no fee for the first EAD.

### B. AYE and Related Immigration Businesses

9.  Based on my investigation, I have reason to believe that beginning at least as early 2012 and continuing through at least March 2020, Torres has operated a "multi-services" business through which she has perpetrated a scheme to defraud USCIS through the submission of at least 1,000 false and fraudulent asylum and work permit applications. Torres, with the assistance of family members and associates, has operated her multi-service business under a variety of names and from various locations. Below is a chart summarizing the business names and addresses used by Torres. (Hereinafter the businesses will be referred to collectively as "the immigration businesses.")

| **Business Name** | **Address** | **Approximate Dates** |
|---|---|---|
| El Latino Multiservices, Inc. | 815 Belvedere Road<br>West Palm Beach, Florida 33401 | 10/17/13 – 2/13/15[1] |
| M&K Multiservices, Inc. | 807 Belvedere Road<br>West Palm Beach, Florida 33401 | 3/24/14 – 6/14/18 |
| L & L Document Services, Inc. | 7000 S Dixie Hwy, Suite 4<br>West Palm Beach, Florida 33405 | 5/5/16 – 5/8/18 |
| AYE Services, Inc. | 420 N. Dixie Hwy<br>Lake Worth, Florida 33460 | 12/21/16 – 7/19[2] |

---

[1] Although bank records establish that Mena's tax scheme began by at least January 2012, we were not able to identify the office used during that period. The first office we were able to identify was the 815 Belvedere Road office, which began receiving fraudulent work permits on or about October 17, 2013.

[2] The business stopped operating out of 420 N. Dixie Hwy in approximately July 2019, shortly after the Government executed a search warrant at the location. However, Torres has continued to operate the business up to the present, contacting out of state victims by cell phone and, in some instances, having them send money and/or documents to AYE Services at the 807 Belvedere Road address.

4

Regardless of the name or location of the business, Torres was always in charge of the business and always operated it in the same fraudulent manner.

### C. Immigration Fraud Scheme

10.     During the course of the investigation, I have identified hundreds of aliens for whom asylum and work permit applications were filed by the immigration businesses and interviewed approximately 15 of them to date. In addition, USCIS, WPB police, and local and out of state immigration attorneys have interviewed and/or taken statements from dozens of individuals who had asylum and/or work permit applications prepared by the immigration businesses. The information contained in paragraphs 10 through 16 of this affidavit is based on witness interviews conducted by myself and/or Agent Galdys and my review of immigration documents, including asylum applications, work permit applications and Alien files. Almost all of the aliens I interviewed during the course of the investigation had been in the United States for more than a year, making them ineligible for asylum absent extraordinary circumstances. Most of the aliens stated that they had asked Torres, whom they knew as "Laura," if she could help them obtain a work permit and/or legal status in the United States. Regardless of whether the aliens qualified for asylum or other immigration benefits, Torres would tell the aliens she could get them work permits and ultimately legal status. Torres would often make up programs under which the aliens purportedly qualified for status, including the "Law of 10 Years," if they had been in the United States for 10 years or more, and the "Family Reunification Program," if the aliens had children in the United States. Torres assured the aliens she would start the process as soon as they paid her the fees, which varied from alien to alien and ranged from approximately $2,500 to $4,000. If an alien did not have the full fee to start "the process," Torres would allow him or her to make a partial payment and remit the balance when the work permit arrived.

11.     Once the alien paid the initial fee, Torres would prepare and file an asylum application with USCIS on his behalf. In most instances, Torres did not tell the aliens she was filing an asylum application on their behalf. Nor did she ask them if they had suffered persecution in their home countries

5

due to their religious, political or ethnic affiliations. Instead, she made up fictitious narratives about persecution the clients supposedly had suffered in their home countries. During the course of the investigation, I obtained and reviewed approximately 50 asylum applications filed by the immigration businesses. I noticed that most of the asylum applications contained similar, and at times identical, stories of persecution – the drug cartel and/or gangs had terrorized their villages, beat them, forced them to sell drugs, raped the females and threatened to kill anyone who didn't join them. In almost all instances, when I showed the asylum applications to the aliens, they confirmed that the basis for asylum stated was completely false and that they had never provided this information to Torres or anyone in her office. Moreover, in many instances the purported signature of the alien had been forged.

12. Torres also solicited immigration clients from outside Florida, including from Tennessee, Georgia, Oregon, Virginia and Alabama. Although these individuals were supposed to list their mailing addresses on their asylum applications, Torres would use a local address owned or controlled by her on their asylum applications.[3] In this way, Torres would receive all communications from USCIS concerning the aliens' asylum applications. In some instances, Torres would "rent" a local address to the out of state aliens for use on their asylum applications. J.T.M., an out of state alien, informed me that "Laura" rented him a West Palm Beach address for his immigration paperwork for $150/month. J.T.M. paid Torres the $150/month "rental" fee for approximately two months and then declined to make any further payments. Another out of state alien, T.M.S., informed me that "Laura" was helping him, his wife and his brother obtain work permits. Laura "rented" them a West Palm Beach address for use on their asylum applications for $400/month/per person, for a total of $1200/month. Torres later agreed to reduce the monthly rental fees to $1,000/month. T.M.S. paid Torres $1200/month and then $1000/month "rental fees" for approximately 1 – 2 years.

---

[3] During the investigation, I determined that the following local addresses owned or controlled by Torres were used on the out of state asylum applications: 1103 Green Pine Boulevard, D-1, West Palm Beach, FL; 625 Monroe Drive, West Palm Beach, FL; and 1941 Abbey Road Apt # 207, West Palm Beach, FL

6

13. In almost all instances after the requisite 150 day time period from the filing of the asylum application had elapsed, Torres or someone in her office would prepare and submit to USCIS a work permit application on behalf of the alien. Instead of listing the alien's U.S. mailing address as required, Torres listed the address of one of the immigration businesses[4]. This caused USCIS to send the work permits and all correspondence related to the work permits to the immigration offices, rather than to the alien. Between October 2013 and April 2019, Torres filed approximately 1,000 work permit applications, all of which used one of the addresses of the immigration offices and all of which were based on a pending asylum application.

14. When Torres received the work permits from USCIS, she would notify the aliens and demand any outstanding fees and, in many instances, additional fees. If the aliens hesitated or refused to pay the additional fees, Torres would threaten to return the work permits to immigration, which she claimed would result in their arrest and deportation. In some instances, the aliens were not able to pay the full fee and Torres would retain their work permit. During the execution of a search warrant at AYE Services in June 2019, agents recovered several original work permits in the client folders.

15. If the aliens paid their fees in full, Torres would give them their work permits. Torres directed the aliens to use their work permits to obtain Social Security cards and to send her copies of the cards. Most of the aliens complied and provided Torres with a copy of their Social Security cards.

16. Many of the aliens received notices to appear for an asylum interview. When the aliens contacted Torres about the notice, she told them she would prepare them for the interview. Some of the aliens met Torres at her office and were shown the asylum application for the first time. Torres told them to memorize the application and tell the immigration officer exactly what was written in the application. In several instances, the aliens told Torres that the asylum claims set forth in the applications were not true.

---

[4] The following addresses were used on the work permit applications: 815 Belvedere Rd., West Palm Beach, FL; 807 Belvedere Rd, West Palm Beach, FL; 7000 S. Dixie Hwy, West Palm Beach, FL; and 420 N. Dixie Hwy, Lake Worth, FL.

7

Torres responded that they needed to say what was in the application if they wanted to stay in the United States. Torres also told the aliens not to tell immigration that she had filled out their applications; instead, they should say someone from church helped them complete the application.

17.  Since asylum applications were often pending for more than a year, Torres would contact the aliens shortly before their work permits were set to expire and offer to renew the work permits, in return for a fee. After the execution of the search warrant in June 2019, Torres continued to contact aliens, seeking to renew their work permits for a fee. I have spoken to approximately 5 out of state aliens who received communications from Torres after June 2019, the date of the search warrant, regarding renewal of their work permits. One alien, T.M.S., sent money and documents to Torres in March 2020, as directed by Torres, in order to renew his work permit.

## Tax Refund Conspiracy/Aggravated Identity Theft (18 U.S.C. §§ 371 and 1028A)

18.  During HSI's investigation, one of the aliens informed me that fraudulent tax returns had been filed in his name. The alien contacted the IRS office and obtained a copy of the fraudulent Treasury refund check issued in his name. The refund check, dated February 10, 2017, listed the alien's name and the address 807 Belvedere Road, West Palm Beach, FL, one of the addresses used by the immigration businesses. From the back of the refund check, agents identified the bank account into which the refund check had been deposited: Bank of America Account No. xxxxxxxx7272, in the name K.H., Attorney at Law (BOA Acct. 7272). I asked Agent Michael A. Galdys to assist with the investigation by looking into the tax fraud allegations.

19.  Agent Galdys obtained and reviewed the bank records for BOA Acct 7272, which revealed that between January 2015 and October 2017, there were a total of 202 US Treasury Checks, totaling approximately $945,000, deposited into the account. A public records and Department of Motor Vehicle search indicate that K.H. is an Immigration Attorney who resides in California. The US Treasury tax refund checks were in the names of approximately 100 individuals, resulting in multiple checks for multiple tax

years made out to the same individual. The majority of the checks were generated from tax returns relating to tax years 2010-2016. Most of the refund checks were mailed to the following addresses, which were owned, controlled, or occupied by Torres or one of her family members: 1103 Green Pine Blvd, D-1, West Palm Beach, FL; 1109 Green Pine Blvd, B-1, West Palm Beach, FL; 1408 Parterre Drive, West Palm Beach, FL; 1426 Crest Drive, Lake Worth, FL; 1951 Tucker Road, West Palm Beach, FL; 3016 Stanford Road, West Palm Beach, FL 3331 Lake Avenue, West Palm Beach, FL; 7000 S. Dixie Highway, Suite 4, West Palm Beach, FL; 815 Belvedere Road, West Palm Beach, FL; and 807-809 Belvedere Road, West Palm Beach, FL.

20. During the course of the investigation, Agent Galdys has reviewed approximately 300 tax returns filed by the immigration offices and the tax refund checks generated from those returns. He has also interviewed approximately 7 of the taxpayers whose refund checks were deposited into BOA Acct 7272. All of the individuals interviewed had sought immigration assistance from "Laura" at the immigration businesses. When Agent Galdys showed them the tax returns filed in their names and the corresponding refund checks, they all stated that they had never seen the tax refund checks or the underlying tax returns, never endorsed the tax refund checks and never received the funds from the tax refund checks. In addition, they all said the returns contained false material information, including false addresses, false education credits, fictitious dependents, and/or fake business expenses and deductions. Finally, they all said they had never signed the false returns. Based on this information, Agent Galdys and I believe that Torres possessed and used, without lawful authority, the means of identification, that is, the names and social security numbers, of approximately 100 individuals, to complete false and fraudulent tax returns in order to obtain and negotiate refund checks issued in their names. Specifically, on or about February 10, 2017, Torres possessed and used the name and social security number of M.J.S. on a 2015 tax return, which resulted in her receiving a tax refund check issued to M.J.S., at 807 Belvedere Rd, West Palm Beach, Florida, for $2,944.88, which was deposited into the BOA 7272 account.

9

21. When I compared the tax refund checks deposited into the BOA 7272 account with immigration filings, I determined that many of the taxpayers whose refund checks were deposited into the BOA account also had immigration applications filed by the immigration businesses. In addition, during the search of Torres' business in July 2019, we recovered more than 100 tax returns, including returns for individuals whose refund checks had been deposited into the BOA 7272 account. A review of the computer found in Torres' office also revealed numerous tax returns, many for individuals we had identified and/or interviewed during the investigation.

## Money Laundering Conspiracy

22. During the course of the conspiracy, Torres and her associates conducted and caused to be conducted numerous financial transactions involving the proceeds of the tax refund scheme, including the movement of tax refund proceeds from BOA Acct 7272 to other accounts controlled by K.H. and/or Torres. These transactions were conducted for the purpose of concealing and disguising the nature, location, source, ownership or control of the proceeds. For example, analysis of BOA Acct 7272 reflected that approximately $92,000 was transferred to other BOA accounts in K.H's name and approximately $3,000 was withdrawn as cash. The estimated $95,000 makes up 10% of the total amount of Treasury refund checks deposited into the account. Further analysis of the BOA Acct 7272 reflected that after the tax refund checks were deposited into the account, a corresponding check would be issued on the account for approximately 90% of the value of the refund check. These checks were made payable to businesses controlled by Torres or to Torres family members and deposited into accounts controlled by Torres. There were no checks issued to any of the taxpayers whose names were listed on the Treasury checks.

## Properties Owned/Controlled by Torres

23. During the course of the conspiracy (approximately 2012 through March 2020), Torres, either directly or through others, purchased a large number of properties, including the following properties in Palm Beach County:

1103 Green Pine Boulevard, D-1, West Palm Beach, FL

10

5211 Kim Court, West Palm Beach, FL
807 Belvedere Road, West Palm Beach, FL
1109 Green Pine Boulevard, B-1, West Palm Beach, FL
3331 Lake Avenue, West Palm Beach, FL
1408 Parterre Drive, West Palm Beach, FL
1414 N. Federal Highway, Lake Worth, FL
1229 Creek Side Drive, Wellington, FL
3016 Stanford Road, West Palm Beach, FL
621 Hudson Road, West Palm Beach, FL
716 Briggs Street, West Palm Beach, FL
911 Green Street, West Palm Beach, FL
732 Forest Hill Boulevard, West Palm Beach, FL
4524 Gun Club Road, Suite 103, West Palm Beach, FL
625 Monroe Drive, West Palm Beach, FL
1426 Crest Drive, Lake Worth, FL

24.     To conceal her ownership and control of these properties, Torres would purchase the properties in the names of family members, including her brothers and her 20 year old son, or the names of businesses she controlled. Torres used many of these properties to facilitate the immigration and tax schemes outlined above. Specifically, Torres used 807 Belvedere Road, West Palm Beach, FL to receive approximately 500 fraudulent work permits from USCIS, and 1103 Green Pine Boulevard, D-1, West Palm Beach, FL, 3016 Stanford Road, West Palm Beach, FL, and 625 Monroe Drive, West Palm Beach, FL, to receive mailings from USCIS related to fraudulent asylum applications she had filed. With regard to the tax refund scheme, Torres used the following addresses to receive fraudulent tax refund checks:

1103 Green Pine Boulevard, D-1, West Palm Beach, FL
807 Belvedere Road, West Palm Beach, FL
809 Belvedere Rd., West Palm Beach FL
1109 Green Pine Boulevard, B-1, West Palm Beach, FL
3331 Lake Avenue, West Palm Beach, FL
1408 Parterre Drive, West Palm Beach, FL
1426 Crest Drive, Lake Worth, FL
1951 Tucker Road, West Palm Beach, FL
3016 Stanford Road, West Palm Beach, FL

### Information from Cooperating Individual (CI) Regarding Properties

25.     During the course of the investigation, I interviewed a CI who was employed by Torres at the immigration businesses from approximately August 2011 through August 2019. Paragraph 25 through 30 are based on information provided by the CI. The CI stated that he/she initially did routine office work

11

for Torres, but later became involved in all aspects of Torres' business. The CI agreed to let Torres use his/her name on the corporate and bank records for many of the businesses. The CI stated that most of the immigration clients would pay Torres in cash. The CI was often responsible for accepting the cash and providing the clients with receipts. The CI would provide the cash to Torres at the end of the day. Sometimes, Torres would direct the CI to make cash deposits into one of the business accounts.

26. In late 2011, Torres began purchasing properties in Palm Beach County. The CI assisted Torres with locating properties to purchase and was responsible for renovating and managing the properties. The CI stated that Torres would sometimes purchase the properties without a mortgage, but other times would arrange to get loans from private lenders and investors. When the properties had mortgages, Torres would direct the CI when and how much to pay the lenders in order to pay-off the mortgage.

27. As the number of properties increased, Torres set up a property management company, Progressive Property Management Inc. ("Progressive"), which Torres asked the CI to run. The CI agreed to let Torres use her name on the corporate and bank records for Progressive. The CI and Torres were the signatories on the Progressive bank accounts. The CI's responsibilities at Progressive included collecting rental income, overseeing repairs, dealing with tenants, and paying the bills related to the properties, including insurance, taxes, and repairs. According to the CI, some of the properties were occupied by Torres' family members and others were rental properties. The CI stated that Torres made all decisions regarding the properties, including when to purchase additional properties, which properties to purchase, who resided in the properties, which repairs were made, and when to sell the properties. Although many of the earlier properties were purchased in the name of Torres' brother, Luis A. Torres Romero, and the later properties in the name of her son, Kevin Torres, a/k/a Kevin Mena, neither of them gave the CI any directions regarding the properties and appeared to have no involvement with the properties. Any time the CI had a question regarding the properties, she would always ask Torres. At a certain point, Torres decided to change the name of the property management company from Progressive to Torres Property Management, Inc. ("Torres"). The CI was one of the signatories on this account. Although the name of

the management company changed, nothing else did - the CI continued to manage the properties at Torres' direction.

28.     When Torres decided to purchase a new property, she would sometimes tell the CI she had a certain amount of money and needed to purchase a property. The CI would assist in identifying a property to purchase. In some instances, prior to the purchase, Torres would bring bags containing cash into the immigration businesses and divide the cash among the CI and other Torres family members, with directions to make cash deposits of less than $10,000 into a specific bank account, which Torres planned to use to purchase the property.

29.     In approximately 2017/2018, Torres told the CI that she was going to put all of her properties in her son, Kevin Torres, a/k/a Kevin Mena's name. At Torees' direction, quit claim deeds were prepared transferring the earlier properties to Kevin Torres, a/k/a Kevin; the CI notarized most of the quit claim deeds at Torres' direction.

30.     Between late 2011 through the summer of 2019, the CI managed the below listed properties, among others, for Torres:

| Property | Current Owner |
|---|---|
| 1103 Green Pine Boulevard, D-1, West Palm Beach, FL | Torres Property Management[5] |
| 5211 Kim Court, West Palm Beach, FL | Torres Property Management |
| 807 Belvedere Road, West Palm Beach, FL | Kevin I. Torres |
| 3331 Lake Avenue, West Palm Beach, FL | Torres Property Management |
| 1408 Parterre Drive, West Palm Beach, FL | Torres Property Management |
| 1229 Creek Side Drive, Wellington, FL | Kevin I. Torres |
| 3016 Stanford Road, West Palm Beach, FL | Sold 6/15/20 |
| 621 Hudson Road, West Palm Beach, FL | Torres Property Management |
| 716 Briggs Street, West Palm Beach, FL | Torres Property Management |
| 911 Green Street, West Palm Beach, FL | Torres Property Management |
| 732 Forest Hill Boulevard, West Palm Beach, FL | Torres Property Management |
| 4524 Gun Club Road, Suite 103, West Palm Beach, FL | Kevin I. Torres |

---

[5] According to Florida corporate records, Torres Property Management, Inc. is located at 4524 Gun Club Road, West Palm Beach. Kevin Mena is listed as the President and Registered Agent.

13

## Forfeiture of Properties

31. I am aware upon information provided by the United States Attorney's Office for the Southern District of Florida that certain property is subject to criminal forfeiture to the United States upon Torres' conviction of the offenses alleged in this Affidavit.

32. Upon conviction of a violation, or criminal conspiracy to violate, 18 U.S.C. § 1546, as alleged in this Affidavit, Torres shall criminally forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(6), the following property:

(a) any conveyance, including any vessel, vehicle, or aircraft used in the commission of such violation; and

(b) any property, real or personal –

(1) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of such violation; or

(2) that was used to facilitate, or was intended to be used to facilitate, the commission of such violation.

33. Upon conviction of a violation, or criminal conspiracy to violate, 18 U.S.C. § 641, as alleged in this Affidavit, Torres shall criminally forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C), as made applicable by 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

Upon conviction of a violation of 18 U.S.C. § 1956(h), as alleged in this Affidavit, Torres shall criminally forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such violation, or any property traceable to such property.

34. Therefore, the property that is subject to criminal forfeiture upon Torres' conviction of the violations alleged in this Affidavit includes, but is not limited to, the following real properties, including all buildings, improvements, fixtures, attachments and easements found therein or thereon, which are known and numbered as follows:

(a) 1103 Green Pine Boulevard, D-1, West Palm Beach, Florida;

(b) 5211 Kim Court, West Palm Beach, Florida;

(c) 807 Belvedere Road, West Palm Beach, Florida;

(d) 3331 Lake Avenue, West Palm Beach, Florida;

(e) 1408 Parterre Drive, West Palm Beach, Florida;

(f) 1229 Creek Side Drive, Wellington, Florida;

(g) 621 Hudson Road, West Palm Beach, Florida;

(h) 716 Briggs Street, West Palm Beach, Florida;

(i) 911 Green Street, West Palm Beach, Florida;

(j) 732 Forest Hill Boulevard, West Palm Beach, Florida; and

(k) 4524 Gun Club Road, Suite 103, West Palm Beach, Florida

## Conclusion

35. Based on the above information, I respectfully submit that probable cause exists to charge Laura Luz Maria Torres Romero, a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried a/k/a Antonieta Mena, with the following offenses: Conspiracy to (a) subscribe under penalty of perjury false statements with respect to material facts in applications submitted to United States Citizenship and Immigration Services, in violation of 18 U.S.C. § 1546(a), and (b) steal IRS refund checks, in violation of 18 U.S.C. § 641, all in violation of 18 U.S.C. § 371; Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; and Conspiracy to launder the proceeds of the tax refund scheme, in violation of 18 U.S.C. § 1956(h), and to issue an arrest warrant for Laura Luz Maria Torres Romero, a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried a/k/a Antonieta Mena.

_____
Carlos Ruiz
Special Agent
Homeland Security Investigations

Sworn and subscribed before me

This __29th__ day of June, 2020.

_____
HONORABLE DAVE LEE BRANNON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No. 20-mj-8229-DLB

UNITED STATES OF AMERICA

vs.

**Laura Luz Maria Torres Romero, aka
Antonieta Vinkelried,
aka Antonieta Winkelried,
aka Antonieta Mena**

      **Defendant.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

      Respectfully submitted,

      ARIANA FAJARDO ORSHAN,
      UNITED STATES ATTORNEY

   BY: _____
      ADRIENNE RABINOWITZ
      ASSISTANT UNITED STATES ATTORNEY
      Florida Bar No./Court No. 833754
      500 S. Australian Avenue, Suite 400
      West Palm Beach, FL 33401 6235
      Tel: (561) 820 8711
      Fax: (561) 820 8777
      Email: adrienne.rabinowitz@usdoj.gov