UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. <u>20-80072-CR-MARRA/MATTHEWMAN</u>

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LAURA LUZ MARIA TORRES ROMERO,

        a/k/a Antonieta Vinkelried

        a/k/a Antonieta Winkelried

        a/k/a Antonieta Mena.

        Defendant.

_____/

## FACTUAL BASIS IN SUPPORT OF GUILTY PLEA

If this case had proceeded to trial, the Government would have established beyond a reasonable doubt that the defendant, Laura Luz Maria Torres Romero (hereinafter "Torres") committed the following offenses:

(1) conspiracy to defraud the United States and to commit immigration and mail fraud, all in violation of Title 18, United States Code, Section 371;

(2) conspiracy to steal and launder Government money, all in violation of Title 18, Untied States Code, Section 371; and

(3) making false statements to the United States Department of Agriculture, in violation of Title 18, Untied States Code, Section 1001(a)(2).

The elements of these offenses are as follows:

<u>Conspiracy to Defraud, to Subscribe False Statements and to Commit Mail Fraud (Count 1)</u>

First:  that two or more persons in some way agreed to try to accomplish a shared and unlawful plan to commit access device fraud, as charged in the information;

Second:  that the defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:  during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the information; and

Fourth:  the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy

The elements of making false statements in an immigration matter are as follows:

First:  that the defendant subscribed as true a false statement;

Second:  that the defendant acted with knowledge that the statement was untrue;

Third:  that the statement was material to the activities or decisions of the United States Citizenship and Immigration Services, that is, it had a natural tendency to influence or was capable of influencing, the agency's decisions or activities;

Fourth:  that the statement was made under penalty of perjury; and

Fifth:  that the statement was made on an application required by immigration laws or regulations.

The elements for mail fraud are as follows:

First:  That the defendant knowingly devised or participated in a scheme to defraud someone, or obtain money or property, using false or fraudulent pretenses, representations, or promises

Second:  That the false or fraudulent pretenses, representations, or promises were about a material fact;

Third:  That the defendant intended to defraud someone; and

Fourth:  That the defendant used the United States Postal Service by mailing or causing to be mailed something meant to help carry out the scheme to defraud.

<u>Conspiracy to Steal and Launder Government Treasury Checks</u>
<u>(Count 2)</u>

First:      that two or more persons in some way agreed to try to accomplish a shared and unlawful plan to commit access device fraud, as charged in the information;

Second:     that the defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:      during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the information; and

Fourth:     the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

The elements of Theft of Government Money are as follows:

First:      that the money or property described in the Information belonged to the United States;

Second:     that the defendant embezzled and stole the money or property to her own use or to someone else's use;

Third:      that the defendant knowingly and willfully intended to deprive the United States of the use or benefit of the money or property; and

Fourth:     that the money or property had a value greater than $1,000.

The elements of Money Laundering are as follows:

First:      that the defendant knowingly conducted or tried to conduct financial transactions:

Second:     that the defendant knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity;

Third:      that the money or property did come from an unlawful activity, specifically, theft of Government money; and

Fourth:     that the defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

<u>False Statement (Count Three)</u>

First:      that the defendant made the statement as charged;

Second:     that the statement was false;

| Third: | that the falsity concerned a material matter; |
|---|---|
| Fourth: | that the defendant acted willfully, knowing that the statement was false; and |
| Fifth: | that the false statement was made or used for a matter within the jurisdiction of a department or agency of the United States. |

To prove that the defendant committed the offenses charged in the Information, the Government would establish beyond a reasonable doubt the following evidence:

**Count One – Immigration Fraud Conspiracy**

The United States Citizenship and Immigration Services ("USCIS") was an agency of the United States Department of Homeland Security responsible for receiving and adjudicating immigrant and non-immigrant applications and petitions, including Form I-589, Application for Asylum and Withholding of Removal ("asylum application"), Form I-765, Application for Employment Authorization, and Form EOIR-42B, Application for Cancellation of Removal. Asylum status was a form of protection available to eligible nonimmigrants present in the United States. To be eligible for asylum status an alien had to establish that he was unable or unwilling to return to his country of nationality or residence because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion. To apply for asylum, an individual was required to file an asylum application with USCIS, within one year of the individual's arrival in the United States. An application filed after the one-year period would be denied unless the applicant established changed circumstances that materially affected the applicant's asylum eligibility or extraordinary circumstances that caused the delay in filing. The applicant was required to sign the

application under penalty of perjury, certifying that the information contained therein was true and correct.

If the asylum application was prepared by someone other than the applicant or the applicant's immediate family member, that person ("the preparer") was also required to sign the application and declare that the information contained therein was true based upon the preparer's personal knowledge or information provided to the preparer by the applicant. In addition, the preparer had to certify that the preparer had read the completed application to the applicant in the applicant's native language or a language the applicant could understand for verification before the alien signed the application in the preparer's presence.

At all times relevant to the Information, if an asylum application was pending for 150 days or more, the applicant was eligible to apply for permission to work in the United States, by filing an application for employment authorization. In such situations, USCIS would automatically grant the application for employment authorization and issue an Employment Authorization Document, also known as a "work permit," without evaluating the merits of the pending asylum claim. This procedure allowed an asylum applicant to continue working during the pendency of the asylum process. If the application for employment authorization was prepared by someone other than the applicant, the preparer was required to sign the application, certifying under penalty of perjury, that the information contained therein was true and correct.

From approximately 2012 through at least March 2020, Torres, with the assistance of co-defendant Wilhelm and others, operated a multiservice business, which provided immigration and other services to the public. The business operated under different

names, including El Latino Multiservices, Inc., M&K Multiservices, Inc., L&L Document Services, Inc., and AYE Services, Inc. (hereinafter referred to collectively as "the immigration business"), and from different locations in Lake Worth and West Palm Beach, Florida. Although the immigration business often listed nominee owners on its corporate and business records, Torres was the true owner, controlled all aspects of the business, and directed its day to day operations. Torres also controlled, either directly or indirectly through nominees, all of the corporate bank accounts.

In approximately 2012, Torres hired co-defendant Melanie Wilhelm (hereinafter "Wilhelm") to serve as her assistant at the immigration business. Under Torres' direction, Wilhelm did the bookkeeping, billing, payroll, and banking for the immigration business. Although WILHELM had no control over the operation or finances of the immigration business, she agreed to let TORRES list her as a corporate officer on the corporate documents and as a signatory on the bank accounts. At TORRES' direction, WILHELM prepared some of the false asylum and work permit applications, forged individuals' names on immigration documents and tax refund checks, and created many of the fraudulent supporting documents for the cancellation of removal applications.

Torres solicited immigration clients primarily by word of mouth. Most of the clients who sought her assistance had illegally entered the United States many years earlier and were ineligible for asylum benefits. Most of the clients were from Guatemala or Honduras, did not speak English, had little formal education, and minimal knowledge of the immigration rules and procedures in the United States. Torres represented herself as an experienced and knowledgeable immigration document preparer, who could assist them with identifying the proper immigration program to secure legal status. Many of the clients

trusted Torres because they knew friends and/or family members who had secured work permits through her.

**TORRES** met with clients at her office or communicated with them by text and phone. Torres would obtain background information from the clients, but never asked them if they had suffered persecution in their native countries or if they were unable or unwilling to return to their native countries because of persecution based on race, religion, nationality, membership in a particular social group or political opinion. Although she had no information to support that the clients were eligible for asylum or other immigration benefits, **TORRES** falsely told them they were eligible for work permits and legal status and made up fictitious programs under which they purportedly qualified for such benefits, including the "Law of 10 Years Program," if they had been in the United States for ten years or more, and the "Family Reunification Program," if they had children in the United States. Torres required the clients to provide her with copies of identity documents for themselves and family members, including passports, birth certificates, drivers licenses, and identification cards.

Torres routinely prepared asylum applications for the clients, regardless of their eligibility for such benefits. Torres rarely told the clients she was preparing asylum applications on their behalf.

When preparing the asylum applications, Torres used the background information obtained from the clients, including their names and dates of birth, to complete the initial sections. In the section where the alien was to provide a detailed and specific account of the basis of his asylum claim, **TORRES** knowingly made up false and fictitious narratives of persecution the clients had purportedly suffered in their native countries. Most of the

applications contained similar, and at times identical, stories of persecution. For example, most of **TORRES'** applications falsely stated that drug cartels and/or gangs had terrorized the client's village, beaten the client, forced him to sell drugs, and threatened to kill him if he refused to join the cartel or gang.

**TORRES** did not show the false and fraudulent asylum applications to the clients. **TORRES** presented some clients with the signature page only and requested they sign the certification in blank. More often, **TORRES, WILHELM,** or a co-conspirator would simply forge the client's name in the certification section of the asylum application. **TORRES** never completed or signed the preparer section of the asylum application in order to conceal from USCIS her role in preparing the false applications.

**TORRES** required her clients to pay up-front cash fees for her services. **TORRES'** fees varied from client to client and increased as the scheme went on, but typically ranged from $2,500 to $4,000 for the initial application. **TORRES, WILHELM,** or a co-conspirator collected the cash fees from the clients. **TORRES, WILHELM,** or a co-conspirator sent the false and fraudulent asylum applications to USCIS by United States Postal Service, from Palm Beach County, Florida, to Mesquite, Texas.

**TORRES** also prepared asylum applications for out of state clients. With these clients, she falsely listed a local address which she owned or controlled as the mailing address so she would receive all correspondence from USCIS. In some instances, **TORRES** charged the out of state clients "rental fees" for the local addresses she fraudulently used on their applications. The "rents" ranged from $150 per month to $400 per month. **TORRES** collected "rental fees" from some out of state clients for up to two years.

After waiting the requisite 150 days, **TORRES** prepared applications for employment authorization for the clients, claiming they were eligible for work permits based on the pending asylum applications, which Torres knew were false. **TORRES, WILHELM**, or another co-conspirator sent the applications to USCIS by United States Postal Service, from Palm Beach County, Florida, to USCIS offices located as follows: Texas Service Center (Texas), Nebraska Service Center (Nebraska), Vermont Service Center (Vermont), Potomac Service Center (Arlington, VA), and National Benefits Center (Missouri).

**TORRES** concealed from USCIS that she had prepared the fraudulent applications for employment authorization by leaving the preparer section blank. In almost all instances, **TORRES** or one of her co-conspirators forged the clients' names on the employment applications. When the work permits arrived, **TORRES** demanded additional fees from the clients. These additional fees would range from approximately $1,500 to $4,500. If a client declined to pay the additional fee, **TORRES** threatened to return the client's work permit which, she claimed, would lead to the client's arrest and deportation.

**TORRES** directed the clients to use their work permits to obtain Social Security cards and to provide her with copies of the Social Security cards.

**TORRES** or a co-conspirator met with the clients at her office to prepare them for their asylum interviews. At the meetings, the clients saw the false asylum applications for the first time. **TORRES** reviewed the applications with the clients and directed them to memorize the details of the false asylum claims. **TORRES** warned the aliens they would not be permitted to stay in the United States if they did not tell the asylum officer exactly what was written in the application.

TORRES or a co-conspirator notified the clients when their work permits were about to expire and offered to renew them, in return for additional fees. TORRES warned the clients they would be arrested and deported if they failed to renew their work permits.

In most instances, the clients' asylum applications were denied by an immigration judge. TORRES would file Cancellation of Removal applications for some clients, in return for additional fees. TORRES, WILHELM and other co-conspirators created and submitted false and fictitious documents, including fake letters from doctors and pastors, fake day care records, fake leases, and fake utility bills, in support of the Cancellation of Removal applications. These false documents were sent to USCIS by United States Postal Service, from Palm Beach County, Florida, to either EOIR for the jurisdiction where the applicant was domiciled or to the United States District Court where the applicant was domiciled.

Records from USCIS revealed that during the course of the conspiracy, TORRES, WILHELM, and their co-conspirators prepared and submitted to USCIS approximately 1,000 falsely subscribed asylum and employment applications, containing materially false statements, which caused USCIS to issue work permits to hundreds of ineligible aliens. In addition, TORRES, WILHELM and their co-conspirators deceived and misled hundreds of clients by promising to provide them with legitimate immigration services and instead filing false immigration applications in their names and providing them with fraudulently procured work permits. Based on interviews of Torres' clients and a review of records obtained from USCIS and Torres' office, agents determined that hundreds of aliens were defrauded by Torres and paid millions of dollars in fees for fraudulently procured work permits. An accounting of Torres' immigration records revealed that TORRES, WILHELM

and their co-conspirators collected at least $2.2 million in cash fees from approximately 368 clients.

In furtherance of the conspiracy and to accomplish the purpose and objects thereof, on or about April 24, 2017, Torres submitted or caused to be submitted to USCIS an application to renew client 3's employment authorization.

**Count Two – Tax Refund/Money Laundering Scheme**

During the course of the immigration scheme, **TORRES** and her co-conspirators obtained personal identifying information, including names, dates of birth, and social security numbers, from immigration clients.  Without the knowledge or consent of the clients, **TORRES** used their personal identifying information to prepare false and fraudulent tax returns, seeking significant refunds.  Torres prepared the false returns in one of her offices or in her home, all of which were located in the Southern District of Florida. The returns included one or more materially false statements, including false addresses, fake education credits, fictitious dependents, false childcare and earned income credits, and false business income, expenses and deductions.  **TORRES** and the co-conspirators forged the clients' names on the fraudulent tax returns and then submitted the returns to the IRS from Palm Beach County, Florida.

In support of the false and fraudulent tax returns, **TORRES, WILHELM** and the co-conspirators created and submitted to the IRS false and fictitious documents, including fake leases, fake childcare receipts, and fake business receipts.

During the first few years of the scheme, **TORRES** directed the IRS to direct deposit the fraudulent refunds into an account at TD Bank, which **TORRES** opened in Palm Beach County using a stolen identity.  Torres opened the TD Bank account using

the name and date of birth of S.P., a Guatemalan native.  When interviewed by HSI agents, S.P. stated he had no knowledge of the TD Bank account, had never authorized Torres to open an account in his name, and had not signed any of the bank documents which purportedly bore his signature.

Later in the scheme, **TORRES** had the IRS mail the fraudulent refund checks to the "home addresses" listed on the returns.  These "home addresses" were in fact properties located in Lake Worth or West Palm Beach, which were owned and/or controlled by **TORRES. WILHELM** and the co-conspirators retrieved the fraudulent tax refund checks from the home addresses listed on the returns and deliver them to **TORRES**.  **TORRES, WILHELM** and other co-conspirators forged the names of the clients on the back of the refund checks.

To conceal her receipt of the refund checks, **TORRES** arranged to have a co-conspirator attorney in California launder the refund checks through the co-conspirator's attorney trust account, in return for a 10 percent fee.   The co-conspirator attorney issued checks drawn on her trust account for 90 percent of the value of the refund check.  At **TORRES'** direction, the co-conspirator attorney made the checks payable to companies **TORRES** owned or controlled.   The checks were mailed to **TORRES'** office in the Southern District of Florida.

**TORRES, WILHELM** or another co-conspirator would deposit the checks issued by the co-conspirator attorney into business accounts controlled by **TORRES**.  The monies from the checks were withdrawn from the accounts by ATM withdrawals, checks and/or wire transfers and used by **TORRES** to benefit herself, **WILHELM** and the other co-conspirators.

During the course of the tax and money laundering scheme, which ran from approximately 2011 through April. 2019, **TORRES** used the names, dates of birth and social security numbers of the immigration clients to file over 200 false tax returns with the IRS, seeking fraudulent refunds totaling approximately $1.8 million. Although the IRS did not issue refunds for all of the fraudulent tax returns, Torres did cause the IRS to issue $1.3 million in fraudulent refunds, which Torres used to benefit herself and her co-conspirators.

In furtherance of the conspiracy and to accomplish the purpose and objects thereof, Torres, Wilhelm or a co-conspirator committed the following overt acts:

1. On or about April 20, 2017, Torres, Wilhelm or a co-conspirator mailed a fraudulently obtained tax refund check, for $2,944.88, issued in the name of client 1, to a co-conspirator in California.

2. On or about September 20, 2019, Torres caused the IRS to mail a tax refund check for $8,327.72, issued in the name of client 4, to 3016 Stanford Road, a property owned by Torres and rented to Wilhelm.

## Count Three – False Statement to USDA

The United States Department of Agriculture (USDA), a department of the United States of America, through the Food Nutrition Service, provides Supplemental Nutrition Assistant Program (SNAP) benefits, formerly known as food stamps, to qualified households of limited income and resources in need of assistance with the purchase of food. Within the State of Florida, the SNAP program is managed by the Florida Department of Children and Families (DCF).

To receive SNAP benefits, an applicant must submit an initial Access Florida Application to DCF. To continue receiving SNAP benefits, applicants must submit annual recertification applications to DCF. In both the initial and recertification applications, the applicant must provide, among other things, the name, social security number, place of birth, citizenship, income, assets and expenses of all household members. This information is material to DCF's eligibility determination and will be carefully reviewed and verified by DCF and other Federal and State agencies. The applicant must sign initial and recertification applications, certifying under penalty of perjury that the information contained in the applications, including the citizen or noncitizen status of those applying for benefits, is true to the best of her knowledge.

After reviewing the information provided by the applicant, DCF and other Federal and State agencies will determine the applicant's eligibility for SNAP benefits. Eligible applicants will be provided with an electronic benefits card which they can use to purchase eligible food items.

Torres received SNAP benefits from at least as early as 2008 through 2020. To establish her continued eligibility for SNAP benefits, Torres submitted annual recertification applications to DCF, from her home in West Palm Beach, Florida. In a recertification application submitted to DCF on March 12, 2018, Torres knowingly and willfully made the following materially false statements: that her name was "Antonieta A. Mena," that she was a United States Citizen, that her household consisted of six persons, that none of the six members of the household owned assets, that the only household income was the defendant's monthly Social Security disability payment, and that she paid monthly rent of $1,200. At the time she submitted the application, Torres knew that her

14

true name was Laura Luz Maria Torres Romero and that she did not have any legal status in the United States; that she listed her deceased mother and two children who did not live with her as household members; that she owned numerous properties in Palm Beach County, which she failed to disclose; that she earned significant income from her immigration and real estate businesses, which were not listed; and that she did not pay monthly rent of $1,200 because she in fact owned the residence where she lived. Torres signed the March 12, 2018 recertification application, knowing that the statements were false and that the information would be used by DCF to determine her continued eligibility for SNAP benefits.

Between 2008 and 2020, Torres received approximately $67,374 in SNAP benefits, for which she was not eligible.

**Forfeiture**

During the course of the immigration and tax refund fraud/money laundering conspiracies, Torres, either directly or through others, purchased a large number of properties, including the following properties in Palm Beach County:

1103 Green Pine Boulevard, D-1, West Palm Beach, FL
807 Belvedere Road, West Palm Beach, FL
3331 Lake Avenue, West Palm Beach, FL
1408 Parterre Drive, West Palm Beach, FL
1229 Creek Side Drive, Wellington, FL
621 Hudson Road, West Palm Beach, FL
716 Briggs Street, West Palm Beach, FL
911 Green Street, West Palm Beach, FL
4524 Gun Club Road, Suite 103, West Palm Beach, FL

To conceal her ownership and control of these properties, Torres purchased the properties in the names of family members, including her brothers and her 20 year old son, or the names of businesses she controlled. Torres used many of these properties

to facilitate the immigration and tax schemes outlined above. Specifically, Torres used 807 Belvedere Road, West Palm Beach, FL to receive approximately 500 fraudulent work permits from USCIS, and 1103 Green Pine Boulevard, D-1, West Palm Beach, FL, 3016 Stanford Road, West Palm Beach, FL, and 625 Monroe Drive, West Palm Beach, FL, to receive mailings from USCIS related to fraudulent asylum applications she had filed. With regard to the tax refund scheme, Torres used the following addresses to receive fraudulent tax refund checks:

1103 Green Pine Boulevard, D-1, West Palm Beach, FL
807 Belvedere Road, West Palm Beach, FL
3331 Lake Avenue, West Palm Beach, FL
1408 Parterre Drive, West Palm Beach, FL

> ARIAN FAJARDO ORSHAN
> UNITED STATES ATTORNEY

By: _____         12/27/2020
    Ellen L. Cohen                          Date
    Assistant United States Attorney


I have reviewed the discovery materials in this case and discussed with my attorney the charges, the evidence, and potential defenses. I have also read and reviewed with my attorney the above statement of facts and stipulate that the facts are true and correct and that I am in fact guilty of the charge set forth in the Information.

_____         12/24/2020
Laura Luz Maria Torres Romero           Date
Defendant

_____         12/27/2020
Bruce A. Zimet, Esq.                    Date.
Counsel for the Defendant